IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| R. ANDREW KETNER and STEPHEN BAKER, individually and on behalf of all other similarly situated individuals, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:14-cv-967 |
| | ) | |
| BRANCH BANKING AND TRUST COMPANY, | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Plaintiffs, R. Andrew Ketner ("Ketner") and Stephen Baker ("Baker"), bring this putative collective action,[1] individually and on behalf of similarly situated individuals, against their former employer, Defendant Branch Banking and Trust Company ("BB&T"), for damages and declaratory relief, alleging violations of The Fair Labor Standards Act, 29 U.S.C. §§ 201–219 (2012) ("FLSA" or "Act").  Before the Court is BB&T's Partial Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (ECF No. 16.) The Court heard oral argument on this motion on September 3, 2015.  For the reasons that follow, the Court denies BB&T's motion.

---

[1] Plaintiffs' prayer of for relief requests that this action be designated as a collective action.  (*See* ECF No. 1 at 15.)  At this time, the Court makes no determination on whether this action qualifies as a collective action under the Fair Labor Standards Act.

# I. BACKGROUND

## A. The Fair Labor Standards Act

Congress enacted FLSA in 1938 to ensure that the nation's workers received "a fair day's pay for a fair day's work." *A. H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945); *see Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) (noting that Congress sought to "protect all covered workers from substandard wages and oppressive working hours"). Though it has been amended over the years, "FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract," *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1527 (2013). The Act requires that employers pay their employees at least the federal minimum wage and provide them overtime in the amount of one and one-half times their regular rate of pay for each hour worked beyond forty hours in a given work week. 29 U.S.C. §§ 206(a)(1), 207(a)(1). FLSA, however, provides for a number of exemptions to this general rule. *See id.* § 213. One type of exemption involves employees who work "in a bona fide executive, administrative, or professional capacity." *Id.* § 213(a)(1). These exemptions are commonly known as the "white collar exemptions," and such employees are exempt from FLSA's minimum wage and overtime compensation requirements. *See id.* While the Act does not define the terms "executive," "administrative," or "professional," Congress has granted the Secretary of the Department of Labor ("DOL") broad authority to define the scope of the white collar exemptions. *See Auer v. Robbins*, 519 U.S. 452, 456 (1997) (quoting 29 U.S.C. § 213(a)(1)). DOL has promulgated regulations defining these terms and the scope of these exemptions. *See* 29 C.F.R. §§ 541.0–541.710 (2015).

2

In determining whether an employee qualifies for a white collar exemption, "job title[s] alone [are] insufficient." *Id.* § 541.2. Rather, employees must satisfy certain tests related to their job duties and salary as set forth in the regulations. *Id.* In general, the job duties test is satisfied if an employee's primary duty is the performance of exempt work. *See id.* § 541.700(a); *see also id.* §§ 541.100(a)(2), .200(a)(2), .300(a)(2). For each of the white collar exemptions, the regulations specify what job duties qualify for exemption. *See* §§ 541.100(a)(2), .200(a)(2), .300(a)(2). Under the salary-basis test, employees must be paid on a salary-basis of at least $455 per week. *Id.* §§ 541.600(a), 602(a). With some exceptions, this test is satisfied if an employee "regularly receives each pay period . . . a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed" or based on the "operating requirements of the business." *Id.* § 541.602(a). "An actual practice of making improper deductions demonstrates that the employer did not intend to pay employees on a salary basis." *Id.* § 541.603(a). The exemption status of an employee "is a matter of affirmative defense on which the employer has the burden of proof." *Clark v. J.M. Benson Co.*, 789 F.2d 282, 286 (4th Cir. 1986) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974)). The burden of proof is high, as the employer must prove "by clear and convincing evidence" that the exemption applies, and such exemptions are to be narrowly construed against the employer. *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564 F.3d 688, 691–92. (4th Cir. 2009).

3

### B. Plaintiffs' Complaint[2]

BB&T is a North Carolina-based company that provides financial services to its customers in several states throughout the country. (ECF No. 1 ¶¶ 4, 6.) BB&T employs, among others, recent college and MBA graduates who must, as a condition of employment, participate in BB&T's Leadership Development Program ("LDP" or "training program") and execute a Training Cost Agreement ("TCA"). (*Id.* ¶¶ 12–13, 20; *see* ECF No. 1-2.) The training program is six to ten months in duration and is offered by BB&T twice per year. (ECF No. 1 ¶¶ 12, 15.) The TCA requires that LDP participants repay the training costs associated with the LDP if they resign or are terminated for cause within five years of their first day of employment as an associate with BB&T. (ECF No. 1-2.) BB&T forgives 1/60th of the training costs for each full month worked by the associate. (*Id.*) BB&T has valued the training costs at $46,000 per LDP participant. (*Id.*)

In July 2012, after signing the TCA, Ketner and Baker entered the LDP. (ECF No. 1 ¶¶ 17–18, 22.) Like other LDP participants, Plaintiffs were paid by the hour as non-exempt employees. (*Id.* ¶ 19.) Ketner's annual salary was $46,000 and Baker's salary was $100,000. (*Id.* ¶¶ 7–8.) During the training program, Plaintiffs attended classes, took examinations, and participated in training events. (*Id.* ¶ 23.) In November 2012, Ketner, while still in the training program, was placed in a "Business Process and Project Improvement Analyst" position at BB&T. (*Id.* ¶ 29.) On March 8, 2013, Plaintiffs and their classmates from the July 2012 class graduated from the training program, (*id.* ¶ 30), and BB&T changed their

---

[2] When considering a motion to dismiss, the court accepts as true the allegations in the complaint and views the complaint in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

classification from non-exempt employees to exempt employees, (*id.* ¶¶ 34–35). Baker was assigned the position of "Research & Strategy Specialist I." (*Id.* ¶ 33.) Ketner, however, continued to work as a "Business Process and Project Improvement Analyst." (*Id.* ¶ 32.) On August 12, 2013, Ketner resigned from his position at BB&T, and Baker resigned about a year later. (*Id.* ¶ 37.) Following their resignations, BB&T notified Plaintiffs that it intended to enforce the TCA and retained a law firm to collect the outstanding balance for the training costs associated with the LDP. (*Id.* ¶¶ 38–39.) The law firm sent Ketner and Baker demand letters, stating that legal action would be taken against them if they did not repay the balance remaining on the training costs under the TCA. (*Id.* ¶ 39; ECF No. 1-3 at 1–2.) The letters demanded $35,982.92 from Ketner and $27,600.00 from Baker. (ECF No. 1-3 at 1–2.) Although Plaintiffs have not repaid any portion of the training costs demanded, BB&T has collected payments from at least two other graduates of the LDP who left BB&T within five years, (ECF No. 1 ¶¶ 42–43).

On November 17, 2014, Plaintiffs filed this action, asserting four claims against BB&T: (1) Count I alleges that BB&T failed to pay them for overtime hours worked during the LDP even though they were classified as non-exempt; (2) Count II alleges that BB&T misclassified them as exempt employees following their graduation from the LDP; (3) Count III alleges that BB&T failed to pay Ketner and other similarly situated individuals the minimum wage as required by FLSA; and (4) Count IV requests that the court enter a declaratory judgment that the TCA is unenforceable against Plaintiffs and other LDP graduates. (ECF No. 1 ¶¶ 47–74.) BB&T moves to dismiss Counts II, III, and IV of

Plaintiffs' Complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 16 at 1–2.)

## II.  STANDARD OF REVIEW

The purpose of a motion made under Rule 12(b)(6) of the Federal Rules of Civil Procedure "is to test the sufficiency of a complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A complaint may fail to state a claim upon which relief can be granted in two ways: first, by failing to state a valid legal cause of action, *i.e.*, a cognizable claim, *see Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012); or second, by failing to allege sufficient facts to support a legal cause of action, *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). A dismissal under Rule 12(b)(6) is appropriate only when the complaint "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Capital Associated Indus., Inc. v. Cooper*, --- F. Supp. 3d ---, 2015 WL 5178057, at *13 (M.D.N.C. 2015) (quoting *Brown v. Target, Inc.*, No. ELH-14-00950, 2015 WL 2452617, at *8 (D. Md. May 20, 2015)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although a plaintiff need only plead a short and plain statement of the claim establishing that he or she is entitled to relief, *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992), "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do," *Twombly*, 550 U.S. at 555. Nor is the court required to accept a plaintiff's legal conclusions. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). In other words, a

6

claim is plausible when the complaint alleges facts that allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Generally, on a motion to dismiss, a district court may not go beyond the complaint without converting it to a motion for summary judgment. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). However, a court may consider documents that are attached to the complaint or incorporated into it. *Id.*

## III. DISCUSSION

### A. Count II: Whether BB&T Misclassified LDP Graduates as Exempt

In Count II of their Complaint, Plaintiffs allege that BB&T misclassified them as exempt employees following their graduation from the training program, making them ineligible for overtime compensation. In particular, Plaintiffs assert that BB&T has, by enforcing the TCA and requiring them to repay their training costs, "subjected them to an actual practice and clear policy" of improper reductions to their salary as proscribed by the salary-basis test. (*See* ECF No. 1 ¶ 59.) According to Plaintiffs, this reimbursement policy demonstrates that BB&T never intended to pay them a predetermined salary as required by the test. (*See* ECF No. 21 at 1.) BB&T denies that Plaintiffs were misclassified as exempt. It argues further that Plaintiffs' Complaint has failed, as a matter of law, to state a violation of the salary-basis test since it does not allege that Plaintiffs' paychecks were actually reduced or subject to reduction during their employment with BB&T. (*See* ECF No. 17 at 10–11.)

Neither party has cited any cases that directly address whether enforcement of an agreement such as the TCA violates the salary-basis test. BB&T cites to cases involving whether an employer can deduct from an exempt employee's fringe benefits, such as

vacation time and accrued leave.  *See Vogel v. Am. Home Prods. Corp. Severance Pay Plan*, 122 F.3d 1065 (4th Cir. 1997) (unpublished table decision) (docking vacation time does not violate FLSA); *McBride v. Peak Wellness Ctr., Inc.*, 688 F.3d 698, 705 (10th Cir. 2012) (deducting accrued leave time from salaries of exempt employees does not violate the salary-basis test).  Plaintiffs cite to cases where exempt employees were suspended for disciplinary reasons without pay.  *See, e.g., Takacs v. Hahn Auto. Corp.*, 246 F.3d 776, 780–81 (6th Cir. 2001) (suspending exempt employees without pay violates the salary-basis test); *Klem v. Cty. of Santa Clara*, 208 F.3d 1085, 1088, 1093 (9th Cir. 2000) (explaining that the defendant's policy of disciplining exempt employees through unpaid suspensions violates the salary-basis test).  None of these cases appears to be dispositive.

　　While there does not appear to be a case that specifically addresses whether enforcement of an agreement like the TCA violates the salary-basis test, *Hoffmann v. Sbarro, Inc.* 982 F. Supp. 249 (S.D.N.Y. 1997), provides some guidance, though, likewise, not dispositive.  In *Hoffmann*, the plaintiffs, who were exempt restaurant managers, brought a collective action under FLSA, alleging violations of FLSA's overtime compensation requirements.  *Id.* at 251. In particular, the managers argued that their employer's policy of requiring them to, among other things, make out-of-pocket reimbursements to the company for cash shortages and other losses that occurred under their supervision violated the salary-basis test.  *Id.*  The company moved to dismiss the complaint, contending, as BB&T contends in this case, that the managers' paychecks were never docked and that their out-of-pocket expenses could not be considered reductions in determining whether the salary-basis

test had been violated.  *Id.* at 254.  Then-District Court Judge Sotomayor declined to dismiss for failure to state a claim, explaining,

> Because this claim raises factual issues as to the nature of the out-of-pocket payments and defendant's intent in requiring them, the Court reserves judgment on this question until there is a clearer factual record as to what defendant's policies and practices were, and under what conditions defendant required employees to make out-of-pocket reimbursements . . . .

*Id.* at 259–60.

Additional guidance is provided by two DOL opinions.[3]  In 2001, DOL was called upon to provide an opinion on whether two proposed incentive programs for exempt pharmacists violated the salary-basis test.  *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, at 1 (Feb. 20, 2001).  Under the first incentive program, pharmacy students would be eligible for summer internship loans provided that they, among other things, sign a written agreement and participate in the company's summer internship program.  *Id.*  Loan recipients who accepted employment with the company would have the amount of each loan payment forgiven for each year worked.  *Id.*  If the pharmacist did not stay at the company for the specified length of time, the company would deduct the loan's principal from the pharmacist's final paycheck.  *Id.*  Similarly, under the second incentive program, the company would provide newly hired pharmacists with a "one-time career incentive payment similar to a sign-on bonus," and if the pharmacist remained employed with the company for two consecutive years, then there would be no repayment obligations.  *Id.*  If the pharmacist

---

[3] Ordinarily, courts defer to DOL's interpretation of its own ambiguous regulation, unless that interpretation is "plainly erroneous or inconsistent with the regulation."  *Auer*, 519 U.S. at 461.

resigned or was terminated before completing two years of employment, then the incentive amount would be deducted from the employee's final paycheck. *Id.*

DOL opined that the incentive programs involved neither a bona fide loan nor a cash advance because "pharmacists who accept employment with the firm do not have an absolute obligation to repay the funds." *Id.* at 2. The incentive programs involved "conditional bonuses, designed to motivate the pharmacists to accept and maintain employment with the company, rather than loans." *Id.* It was DOL's position that these programs made the pharmacists' salary subject to reduction based on the quantity of work they performed. *See id.* DOL opined that "the entire class of pharmacists who participate in these programs cannot meet the exemption's 'salary basis' requirement for all workweeks during which this policy is in effect," "irrespective of whether deductions are actually taken, or, if taken, reduce the pharmacist's salary below the minimum salary amount required under the regulations." *Id.*

In 2006, DOL issued an opinion on whether an employer could make deductions from an exempt employee's salary or require that employee to reimburse the employer for damage to or loss of company equipment without violating the salary-basis test. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, at 1 (Mar. 10, 2006). DOL concluded that a policy that allowed for such deductions violated the salary-basis test. *Id.* DOL opined that "deductions from the salaries of otherwise exempt employees for the loss, damage, or destruction of the employer's funds or property due to the employees' failure to properly carry out their managerial duties . . . would defeat the exemption because the salaries would not be 'guaranteed' or paid 'free and clear' as required by the regulations." *Id.* Such

deductions were made based on "the quality of the work performed by the employee." *Id.* DOL made clear that "[i]t would not matter whether an employer implements such a policy by making periodic deductions from employee salaries, or by requiring employees to make out-of-pocket- reimbursements from compensation already received," as "[e]ither approach would result in employees not receiving their predetermined salaries when due on a 'guaranteed' basis or 'free and clear.'" *Id.* at 2.

Here, Plaintiffs allege that BB&T has violated the salary-basis test by "subject[ing] them to an actual practice and clear policy of requiring [them] . . . to pay back 'Training Costs' up to $46,000" if they left BB&T within five years. (ECF No. 1 ¶ 59.) As in *Hoffmann*, Plaintiffs allege that because BB&T has violated the salary-basis test, they are non-exempt employees who have worked in excess of forty hours per week without overtime pay in violation of the Act's overtime compensation requirements. (*Id.* ¶ 60.) Although the employer in *Hoffmann* advanced the same argument BB&T is advancing in this action, *i.e.*, that an exemption is lost only when an employer makes deductions from its employees' paychecks, the court declined to dismiss the restaurant managers' complaint for failure to state a claim as a matter of law. Rather, the court stated that factual development was necessary to determine "the nature of the out-of-pocket payments and defendant's intent in requiring them." *Hoffmann*, 982 F. Supp. at 259. Moreover, the 2001 DOL opinion appears to reject BB&T's contention that a reimbursement policy such as the TCA is similar to a bona fide loan and therefore does not violate the salary-basis test. Like the incentive program at issue in that opinion, Plaintiffs' allegations demonstrate that they do not have an absolute obligation to repay the training costs since, if they remain with the company for five

11

years, BB&T forgives the loan.[4]  Although the 2001 opinion referred only to deductions in

the pharmacists' paychecks, DOL's 2006 opinion makes it clear that an out-of-pocket

reimbursement policy like the TCA can also violate the salary-basis test, even though no

deductions are made from an employee's paycheck.  *See* U.S. Dep't of Labor, Wage & Hour

Div., Opinion Letter, at 2 (Mar. 10, 2006).  The Court is therefore persuaded that Plaintiffs

have sufficiently stated a cognizable violation of the salary-basis test in Count II of the

Complaint.

In its effort to distinguish the DOL opinions, BB&T asserts that the 2001 opinion

dealt only with payroll deductions and the 2006 opinion "disregards the plain language of the

interpreting regulations." (ECF No. 23 at 4, 6.)  BB&T argues that the regulations "contain

no mention whatsoever of kick-backs, *de facto* deductions, or deductions from sources of

compensation other than the salary." (*Id.* at 5.)  BB&T therefore urges the Court to "lend

no credence to the 2006 opinion letter." (*Id.* at 6.)

BB&T is correct that 29 C.F.R. §§ 541.602 and 541.603 do not expressly speak to

whether a reimbursement policy, such as the TCA, implicates the salary-basis test.  However,

the Court must reject BB&T's argument that an employee's paycheck must actually be

reduced or be subject to reduction for there to be a violation of the salary-basis test.  If that

were the case, rather than making deductions from an employee's paycheck, an employer

---

[4] At oral argument, counsel for BB&T represented that if LDP participants resign from the training program, then they do not have to repay the costs associated with the training program.  Counsel stated, "It's when they say, 'yes, I am going to come work for you,' that the repayment obligation would kick in."  After inquiry from the Court on that statement, counsel stated that this information will be supplemented.  It is, therefore, not clear whether BB&T enforces the TCA if an individual participates in the training program but does not join BB&T as an associate after completing it.  In the event BB&T does not seek enforcement of the TCA in those circumstances, it would appear to weaken BB&T's argument that the TCA is a bona fide repayment obligation.

could easily manipulate the exemption requirements by mandating that exempt employees write a check payable to the employer—for the same amount of the would-be payroll deduction—immediately after the employer hands over the payroll check. The only difference in these two approaches is one of form, as the substance of either practice would effectively yield the same result. For this Court to dismiss this action based on BB&T's rigid interpretation of FLSA's implementing regulations would make the salary-basis test a nullity. *See Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 703 (1991) (explaining that the expression of one method may support an inference that the drafter intended to exclude other methods but "such an inference provides no guidance where its application would render a regulation inconsistent with the purpose and language of the authorizing statute"); *cf. EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 120 (1988) (plurality opinion) (rejecting the respondent's statutory interpretation because it would lead to absurd results that are plainly at variance with the policy behind the legislation); *Sigmon Coal Co. v. Apfel*, 226 F.3d 291, 304 (4th Cir. 2000) (explaining that if a literal reading of a regulation results in an outcome that is at "demonstrably at odds" with Congress's clearly expressed intent or can "truly be characterized as absurd," then courts may look beyond the unambiguous regulation).

Nor does the Court believe that the language of the regulations bars a claim that out-of-pocket reimbursements violate the salary-basis test. Contrary to BB&T's argument that "salary reductions refer only to mandatory deductions from an employee's guaranteed salary," (ECF No. 17 at 9), the regulations do not exclude alternative interpretations. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (noting that unless an "alternative reading is compelled by the regulation's plain language," the court defers to the Secretary's

interpretation) (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988))); *see also Whetsel v. Network Prop. Servs., LLC*, 246 F.3d 897, 901 (7th Cir. 2001) (explaining that the Supreme Court had rejected an agency's interpretation of its own regulation only when that interpretation contradicts the explicit language of the regulation). Nowhere in the regulations are the terms "compensation" or "salary" defined. *See* 29 C.F.R. §§ 541.600–541.606. The regulations are thus silent on whether the TCA or similar agreements fall within the scope of practices covered by the salary-basis test. Such silence demonstrates that the regulations are ambiguous because they are susceptible to BB&T's interpretation or the one expressed in the 2006 DOL opinion. *See IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 295 (4th Cir. 2007) (deferring to the Secretary after finding that the combination-exemption regulation is silent and therefore ambiguous as it was susceptible to more than one interpretation); *cf. Auer,* 519 U.S. at 457 (explaining that the Court "must sustain the Secretary's approach" when Congress has not directly spoken to the precise question at issue, to the extent that such an approach is a permitted construction of the statute); *Am. Airlines, Inc. v. United States*, 551 F.3d 1294, 1300 (Fed. Cir. 2008) (noting that the court defers to the agency's interpretation of its own regulations when the regulation's language is "ambiguous or susceptible to more than one plausible reading"). Consequently, this Court defers to DOL's interpretation of its regulations as contained in the 2006 opinion letter. *Dickenson-Russell Coal Co. v. Sec'y of Labor*, 747 F.3d 251, 257 (4th Cir. 2014) ("If the regulation is ambiguous, we apply *Auer* deference, meaning that the agency's interpretation controls unless that interpretation is 'plainly erroneous or inconsistent with the regulation.'" (quoting *Auer*, 519 U.S. at 461)). To do otherwise, as BB&T advocates, would not only hamper

14

DOL's ability to enforce the salary-basis test, it would also frustrate Congress's goals in enacting FLSA in the first place. "The FLSA should be broadly interpreted and applied to effectuate its goals." *Purdham v. Fairfax Cty. Sch. Bd.*, 637 F.3d 421, 427 (4th Cir. 2011).

Because the 2006 DOL opinion is reasonable and conforms to the purpose of FLSA and the salary-basis test, the Court denies BB&T's request to disregard it.[5] *See Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150–51 (1991). This Court concludes Plaintiffs have stated a plausible claim that BB&T misclassified them as exempt based on alleged violations of FLSA's salary-basis test.

BB&T further contends that Count II of Plaintiffs' Complaint should be dismissed because Plaintiffs' allegations about their job duties are nominal and insufficient for the Court to conduct the duties analysis. (*See* ECF No. 23 at 2; ECF No. 17 at 7 n.2.) The Court disagrees. Plaintiffs' Complaint alleges that when Ketner graduated from the LDP, there was "no material change in his primary job responsibilities" and that "[h]e continued to work overtime on a regular basis, and received no overtime compensation for his overtime hours." (ECF No. 1 ¶ 32.) The Complaint also alleges that Plaintiffs "were placed in job positions . . . that did not require them to exercise discretion and independent judgment with

---

[5] Even if, for the sake of argument, the 2006 DOL opinion is not entitled to the degree of deference announced in *Auer* because 29 C.F.R. § 541.602 is unambiguous, the opinion is still "entitled to respect . . . to the extent that [it] ha[s] the 'power to persuade.'" *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). The weight to afford such an opinion "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140. Contrary to BB&T's attempt to characterize the 2006 opinion as an aberration, the phrase "free and clear" has been associated with the "guaranteed" salary requirement of the salary-basis test since 1940, *see* Defining and Delimiting Exemptions for Executive Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,176 (Apr. 23, 2004), and has been referenced in a number of DOL opinions, *see, e.g.*, U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, at 7 n.5 (Nov. 27, 2006); U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, at 1 (Mar. 2, 1995).

respect to matters of significance" and "were assigned to clerical-type positions." (*Id.* ¶ 61.) Although Baker earned $100,000 and therefore was subject to a more relaxed job duties analysis as a "highly compensated employee," *see* 29 C.F.R. § 541.601(a), he must still satisfy the requirements for exemption. *Wood v. Kinetic Sys., Inc.*, No. 1:10-CV-001-CWD, 2011 WL 1484117, at *3 (D. Idaho, Apr. 19, 2011) (explaining that "while the analysis of a highly compensated executive, administrative, or professional employee's primary duties may be reduced or streamlined, the employer still must establish that the employee" performs the required duties for exemption.) Because exemptions are affirmative defenses and must be narrowly construed against the employer with the employer bearing the burden of proof, the Court concludes that Plaintiffs have sufficiently alleged a violation of the duties test to survive a motion to dismiss under Rule 12(b)(6). *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (noting that a court may decide an affirmative defense on a motion to dismiss only when the facts necessary to the affirmative defense clearly appear on the complaint's face).

### B. Count III: Whether BB&T Violated FLSA's Minimum Wage Requirement

In Count III of the Complaint, Ketner asserts[6] that enforcement of the TCA violates FLSA because it has the effect of requiring employees to work for wages lower than minimum wage and further that their wages were not paid "free and clear" as required by the Act. (ECF No. 1 ¶ 66.) BB&T moves to dismiss this claim on two grounds. First, BB&T argues that there is no case or controversy because Ketner has no personal stake in this case

---

[6] Baker is unable to assert this claim since he earned $100,000 and repayment of the training costs as required by the TCA would not cause his salary to fall below the minimum wage.

since he has not repaid any portion of his loan obligation. (ECF No. 17 at 12–13.) Second, BB&T argues that, even if there was a case or controversy, Ketner and other similarly situated employees have failed to allege a plausible claim that BB&T's enforcement of the TCA violates FLSA's minimum wage requirement. (*Id.* at 13.) Because BB&T's argument that there is no case or controversy is a threshold issue that challenges the Court's power to hear this issue, the Court must first address this argument.[7] *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 479–80 (4th Cir. 2005) ("[A] Federal Circuit must determine that it has subject-matter jurisdiction over the case before it can pass on the merits of that case.").

Article III of the United States Constitution "confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984). To invoke a federal court's jurisdiction, "a plaintiff must demonstrate that he possesses a legally cognizable interest, or 'personal stake', in the outcome." *Genesis Healthcare Corp.*, 133 S. Ct. at 1528. There must be a dispute that "is definite and concrete, touching the legal relations of parties having adverse legal interests." *White v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 913 F.2d 165, 167 (4th Cir. 1990) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41(1937)). In other words, a party invoking the court's jurisdiction must demonstrate an injury in fact to establish standing, *i.e.*, he or she must show "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent,' not 'conjectural' or 'hypothetical.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations

---

[7] Though BB&T does not raise lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, its argument is one of jurisdiction.

omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). The Fourth Circuit has recognized that the threat of litigation can satisfy the standing requirement for there to be an Article III case or controversy. *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 593–94 (4th Cir. 2004).

Here, there is an actual controversy between the parties. Ketner disputes the validity of the TCA and BB&T's alleged right of repayment of the training costs under it. Further, BB&T has hired a law firm that has sent Ketner collection letters, demanding payment under the TCA and threatening legal action if payment was not made. (*See* ECF No. 1-3 at 1–2 ("It is our desire to give your client an opportunity to resolve this claim before legal action becomes necessary . . . .").) BB&T has enforced the TCA against other graduates of the LDP in the past, recovering money from these individuals. (ECF No. 1 ¶ 42.) Such actions on the part of BB&T demonstrate that Ketner's injury is neither speculative nor hypothetical but is based on BB&T's adverse collection activities and on "an objective and reasonable apprehension of future litigation" regarding his alleged payment obligations under the TCA. *See Energy Recovery, Inc. v. Hauge*, 133 F. Supp. 2d 814, 817 (E.D. Va. 2000). Accordingly, Ketner has standing to pursue this action.

The Court next addresses whether Ketner states a plausible claim that BB&T's enforcement of the TCA violates FLSA's minimum wage requirement. To state a claim for violation of FLSA's minimum wage provision, a plaintiff must allege that "(1) [he was] employed by Defendant; (2) [his] work 'involved interstate activity'; and (3) '[he] performed work for which [he was] undercompensated.'" *Sanchez v. Truse Trucking, Inc.*, 74 F. Supp. 3d 716, 721 (M.D.N.C. 2014) (quoting *Pruell v. Caritas Christi*, 678 F.3d 10, 12 (1st Cir. 2012)).

There is no dispute that the first two factors have been satisfied. As it relates to the third factor, Ketner alleges that his "wages were conditionally paid" and not "free and clear" because BB&T now seeks to recoup $35,982.92 in earned wages by enforcing the TCA. (ECF No. 1 ¶¶ 40, 66.) He further alleges that enforcement of the TCA would result in him earning less than $7.25, the minimum wage, for the thirteen months he worked for BB&T. (*Id.* ¶ 66); *see* 29 U.S.C. § 206(a)(1)(C) (setting the minimum wage). Ketner points to 29 C.F.R. § 531.35 of FLSA's implementing regulations, which provides that "[w]hether in cash or in facilities, 'wages' cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or 'free and clear,'" 29 C.F.R. § 531.35. (*See* ECF No. 21 at 16). BB&T, however, maintains that the TCA is a voluntarily accepted loan and not a kick-back prohibited by 29 C.F.R. § 531.35. As support, BB&T relies primarily on *Heder v. City of Two Rivers*, 295 F.3d 777 (7th Cir. 2002), and *Gordon v. City of Oakland*, 627 F.3d 1092 (9th Cir. 2010).

BB&T's reliance on *Heder* is misplaced. *Heder* was on appeal after the district court's entry of partial summary judgment and did not address whether out-of-pocket reimbursements, such as the TCA, constituted kick-backs under 29 C.F.R. § 531.35. Rather, *Heder* dealt with whether an agreement that required firefighters to reimburse the city for their paramedic training if they failed to remain employed with the city for the required length of time was valid and enforceable under Wisconsin law. *See* 295 F.3d at 780–82. *Gordon*'s reliance on *Heder* for the proposition that the police training agreement was not a kick-back under 29 C.F.R. § 531.35 is therefore misplaced. *See Gordon*, 627 F.3d at 1095–96.

19

Moreover, unlike in *Heder* and *Gordon*, where the plaintiffs received a certification recognized beyond their former employers, Ketner challenges BB&T's training program as not conferring to him any benefit that is recognized within the broader marketplace or to him as an associate. (*See* ECF No. 21 at 12; ECF No. 1 ¶ 61.) Further, the costs of the training programs in *Heder* and *Gordon* were substantially less than the alleged costs of BB&T's training program. *See Heder*, 295 F.3d at 782 (noting that the full cost of tuition and books came to approximately $1,400); *Gordon*, 627 F.3d at 1093 (noting that the cost of training was $8,000). In this case, the training costs of the LDP is the same as Ketner's entire yearly salary. BB&T did not adjust the cost of the training despite some training programs allegedly lasting six months while others ten months, (ECF No. 1 ¶ 15). This Court concludes that Ketner has alleged a plausible claim that the $35,982.92 BB&T seeks to collect from him constitutes a kick-back of the $46,000 BB&T paid to him and, thus, would violate FLSA's minimum wage requirement. Ultimately, factual development of this case will determine whether the costs of training for the LDP is a bona fide loan as asserted by BB&T or a kick-back of salary as alleged by Ketner.[8] BB&T's motion to dismiss Count III is denied.

---

[8] BB&T also argues that the LDP is similar to the reimbursement agreements in *Booth v. Electronic Data Systems Corp.*, 799 F. Supp. 1086 (D. Kan. 1992), and *Wilbur v. Silgan Containers Corp.*, No. 2:06-cv-02181-MCE-EFB, 2008 WL 3863700 (E.D. Cal. Aug. 19, 2008). In both cases, the courts held that the employees had to reimburse their employers for certain training and educational expenses because they did not remain employed at the company for the duration specified in the agreement they executed. However, these cases are distinguishable. In *Booth*, the plaintiff did not attack the validity of the promissory note he signed on the ground that repayment of the $9,000 would reduce his salary below FLSA's minimum wage. *See* 799 F. Supp. at 1094. In *Wilbur*, the employer paid part of the plaintiff's educational expenses as he pursued and ultimately obtained an MBA from the University of Phoenix, and when the employer moved for summary judgment based on plaintiff's failure to repay the educational expenses, the plaintiff did not oppose the employer's motion. 2008 WL 3863700, at *12–13.

## C. Count IV: Declaratory Judgment Claim

In support of its motion to dismiss Plaintiffs' declaratory judgment claim, BB&T first argues that there is no justiciable case or controversy as it relates to Ketner's minimum wage claim and that there are no allegations that enforcement of the TCA reduced Baker's compensation to less than the minimum wage. (ECF No. 17 at 17.) Further, BB&T contends that the declaratory judgment claim raises the same issues contained in Counts II and III. (*See id.* at 18; *see also* ECF No. 23 at 10.) BB&T therefore urges the Court to dismiss Count IV on the ground that a determination on the declaratory judgment claim would serve no useful purpose. (*See* ECF No. 17 at 18.)

As already noted, federal courts are limited to disputes that are "definite and concrete, touching the legal relations of parties having adverse interests." *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1119 (4th Cir. 2014) (quoting *Aetna Life Ins. Co.*, 300 U.S. at 240–41). "The same standard applies to a request for declaratory relief and requires a controversy of 'sufficient immediacy and reality [as] to warrant the issuance of a declaratory judgment.'" *Id.* (quoting *White,* 913 F.2d at 167–68). In cases where there is an actual controversy between the parties, the Federal Declaratory Judgment Act allows federal courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (2012); *Volvo Constr. Equip. N. Am., Inc.*, 386 F.3d at 592. "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. In determining whether to entertain a request for declaratory relief, the Fourth Circuit has instructed district courts to consider whether such a request "'will serve a useful purpose in clarifying and

settling the legal relations in issue,' and 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Volvo Constr. Equip. N. Am, Inc.*, 386 F.3d at 594 (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)). Whether to assert jurisdiction over claims for declaratory relief is within the sound discretion of the district court. *Id.*

Having already determined that there is a case or controversy with respect to Ketner's minimum wage claim, the Court likewise finds that there is an actual controversy between Plaintiffs and BB&T involving Plaintiffs' claim that BB&T failed to compensate them for overtime in violation of the Act.[9]  In addition, the Court rejects BB&T's argument that the declaratory judgment claim should be dismissed because it raises the same issues in Counts II and III.  Although BB&T has cited cases where courts have dismissed declaratory judgment claims brought alongside the same substantive claims, there is no requirement that the Court do so.  *See Powell v. McCormack*, 395 U.S. 486, 518 (1969) (noting that "a request for declaratory relief may be considered independently of whether other forms of relief are appropriate"); *Tierney v. Schweiker*, 718 F.2d 449, 457 (D.C. Cir. 1983) (explaining that "declaratory relief is alternative or cumulative and not exclusive or extraordinary" and the existence of "another remedy [that] would be equally effective affords no ground for declining declaratory relief").  A ruling on the declaratory judgment claim may put an end to the uncertainty, insecurity, and the controversy involving the validity and enforcement of the TCA, irrespective of whether it is favorable to Plaintiffs or BB&T.  At this stage in the

---

[9] Baker does not allege that enforcement of the TCA would bring his salary below the statutory minimum wage. Baker's claim is limited to the issue of overtime.

litigation, the Court will exercise its discretion in favor of allowing the declaratory judgment claim to proceed. BB&T's motion to dismiss this claim is denied.

## IV. CONCLUSION

For the reasons outlined above, the Court concludes that BB&T's Partial Motion to Dismiss must be denied in its entirety.[10]

### ORDER

IT IS THEREFORE ORDERED that BB&T's Partial Motion to Dismiss (ECF No. 16) is DENIED.

This, the 29th day of October, 2015.

_____/s/ Loretta C. Biggs_____
United States District Judge

---

[10] BB&T asserts that the statute of limitations for Count II and Count III should be restricted to two years instead of three years. (*See* ECF No. 17 at 6 n.1.) Generally, the statute of limitations for unpaid minimum wages and overtime compensation under FLSA is two years, but it can be extended to three years when the employer's actions are willful. *See* 29 U.S.C. § 255(a). For the reasons the Court declines to dismiss Counts II and III as discussed herein, the Court will not restrict the statute of limitations to two years. Plaintiffs have alleged sufficient facts that BB&T's actions are willful to satisfy *Twombly/Iqbal*'s pleading standard.